Ronaldo A. Coulter (ISB No. 3850)
IDAHO EMPLOYMENT LAW SOLUTIONS
776 E. Riverside Drive, Suite 206
P.O. Box 1833
Eagle, Idaho 83616
Telephone: (208) 672 6112
Facsimile: (208) 672 6114
ron@idahoels.com

*Attorney for Plaintiff*

**THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **MICHAEL E. BROWN, an individual** ) | |
| ) | **Case No._____** |
| **Plaintiff** ) | |
| ) | |
| **vs.** ) | |
| ) | **COMPLAINT AND DEMAND FOR** |
| **DIAMOND LINE DELIVERY** ) | **JURY TRIAL** |
| **SYSTEMS INC.,** ) | |
| ) | |
| ) | |
| **Defendant** ) | |
| _____ ) | |

**COMPLAINT**

Comes now Michael E. Brown, by and through his counsel of record, Ronaldo A. Coulter of

the law firm of Idaho Employment Law Solutions, PLLC, and for causes of action against the above

named Defendant complains and alleges as follows:

**I.  INTRODUCTION[1]**

---

[1] There is no rule, statute, or case law that prohibits Plaintiff from including an introduction as a straightforward and general statement intended to educate the court on important facts and events which precipitated the filing of the complaint.  The case of *Hearns v. San Bernardino Police Department,* 530 F.3d. 1124, 1129-1133 (9th Cir. 2008) is instructive.  In discussing Plaintiff

On June 18, 2007, Michael E. Brown, a devout and practicing member of the Church of JESUS CHRIST of Latter-Day Saints (LDS) was hired  by Diamond Line Delivery Systems, Inc. (herein referred to as DLDS) as the first full time Loss Prevention Director for the Defendant. In that capacity, Mr. Brown was serving as upper management/executive for DLDS.  While in this position, Mr. Brown had the authority to hire and fire employees as dictated by the needs of DLDS. Later, Mr. Brown was one of only two employees who had to approve of any new hire.  On or about September 28, 2017, Mr. Brown had surgery to replace both of his knees. Mr. Calvin Fillmore serves in the capacity as the Corporate President of DLDS.  Mr. Calvin Fillmore has been described by his spouse, Ms. Myrna Fillmore as a "Jack-Mormon" who is not practicing the LDS faith.[2]  Prior to undergoing a double knee replacement, Mr. Calvin Fillmore raised questions about Mr. Brown being able to perform his duties remotely from home while Mr. Brown recovered from surgery. Soon after Mr. Brown's surgery, and as a result of Mr. Fillmore's actions, Mr. Brown's suffered a significant loss in responsibilities that he had previously held. Mr. Brown justifiably felt that because of his knee surgery, Mr. Calvin Fillmore wanted Mr. Brown to leave DLDS. However, Mr. Brown would not voluntarily terminate his position with DLDS. In the late Summer or early Fall of 2018, Mr. Calvin Fillmore tried to persuade Mr. Brown to resign

---

Hearns' complaint, the court noted that ". . . the overview was relevant to Plaintiff's causes of action for employment discrimination.  Nor was it "confusing and conclusory.""  *Id.* at 1132.

[2] "The term **Jack Mormon** is a slang term originating in nineteenth-century America. It was originally used to describe a person who was not a baptized member of the Church of Jesus Christ of Latter Day Saints but who was friendly to church members and Mormonism, sympathized with them, and/or took an active interest in their belief system. Sometime in the early- to mid-twentieth century, however, the term began to refer to an individual deemed by adherents of The Church of Jesus Christ of Latter-day Saints (LDS Church) to be an inactive or lapsed member of the LDS Church who, despite his personal religious viewpoint, maintained good relations with and positive feelings toward the church." https://en.wikipedia.org/wiki/Jack_Mormon

from his position on the DLDS's Board of Directors.  Finally, on November 1, 2018, Mr.

Calvin Fillmore terminated the employment of Mr. Brown for allegedly lying about "telling

the management team that you [Mr. Brown] would be in Twin Falls training our [DLDS] new

terminal manager on Safety and Hiring Practices on Thursday afternoon and Friday and then

not showing up on Thursday afternoon…" The "no show"  accusation had no basis in fact.

Rather than working on his own private business as alleged by Mr. Calvin Fillmore, at all

relevant times, Mr. Brown was only engaged in duties related to his position as an employee

of DLDS.  Further, as the Statement of Facts herein will show, that DLDS in terminating Mr.

Brown in the manner that DLDS did, that Mr. Brown was subjected to very different

treatment than similarly situated non-LDS management and upper management employees

who were involved in (1)  very serious alcohol and drug  related incidents, and (2) engaged in

running private business contrary to DLDS policy and in direct competition with DLDS.

       Plaintiff, alleges herein that he has been unlawfully discriminated against by the

Defendant.  This discrimination is based on Plaintiff being regarded as having a disability as well

as the  Plaintiff being a devout and practicing member of the LDS church.  The Defendant

through the action of its agent Mr. Calvin Fillmore in terminating Mr. Brown, has denied Mr.

Brown the opportunity to enjoy the terms, conditions, and privileges of his employment with

DLDS. As the Statement of Facts herein will demonstrate. Mr. Brown's termination was in

violation of 42 U.S.C. § 12101 et seq. (Americans with Disabilities Act), 42 U.S.C. § 2000e et

seq., Title VII of the Civil Rights Act of 1964 as amended [3] and  I.C. § 67-5909.

---

[3]  Under 42 U.S.C. § 2000e-2a(1), it is  an unlawful employment practice for an employer "to fail
or refuse to hire or to discharge any individual, or otherwise to discriminate against any
individual with respect to his compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or national origin…"

## II.  PARTIES

1.       Mr. Brown is a former employee of DLDS who was terminated from his employment with the Defendant on November 1, 2018.  Mr. Brown currently resides in the State of Idaho.

2.       On information and belief, the Defendant, DLDS is a corporation in good standing in the State of Idaho. Idaho Secretary of State records show that DLDS is registered with identification number C134127 whose registered agent is Myrna Fillmore, 1450 N. Hickory Avenue, Meridian, Idaho 83642.

## III. JURISDICTION, VENUE, AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.       This action is brought to secure relief to remedy discrimination in violation of 42 U.S.C. 12101 et. seq. the Americans with Disabilities Act as Amended. Jurisdiction  is proper per 28 U.S.C.§§1331and 1332.

4.       This action is also brought to secure relief to remedy discrimination on the basis of religion  in regards to the terms, conditions and privileges of employment all in violation 42 U.S.C. § 2000e et seq., Title VII of the Civil Rights Act of 1964 as amended which is incorporated by reference in I.C. §§ 67-5901 and 67-5909 (1). Jurisdiction  is proper per 28 U.S.C.§§1331 and 1332.

5.       Plaintiff timely filed his complaint of unlawful discrimination with the Idaho Human Rights Commission (IHRC) on or about April 30, 2019.

6.       The IHRC issued a 90-day Notice of Right to Sue letter to Plaintiff on November 1, 2019,  Plaintiff has exhausted his administrative remedies pursuant to 42 U.S.C. § 2000e-5 and Idaho Code § 67-5908(2). Ninety days from November 1, 2019  is Thursday,  January 30, 2020.

7.    Pursuant to 42 U.S.C. § 2000e-5(f)(1) and 42 U.S.C. § 2000e-5(f)(3), Plaintiff brings this action in, and jurisdiction is proper in, the United States District Court for the District of Idaho.

8.    Jurisdiction of this court for any pendent or future supplemental claims is authorized by 28 U.S.C. § 1367(a) and Fed. R. Civ. P. 18(a), and arises under the doctrine of pendent jurisdiction as set forth in *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966). *See also DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332 (2006).

9.    Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3).

### IV. STATEMENT OF FACTS

**Mr. Brown Being Regarded as a Person with a Disability and Loss of Responsibilities**

10.   Mr. Brown began working for DLDS on June 18, 2007 as the first full time Loss Prevention Manager.

11.   Mr. Calvin Fillmore, the prior owner of DLDS, was serving DLDS in the capacity as DLDS's Corporate President at the time he terminated Mr. Brown's employment with DLDS.

12.   From June 18, 2007 through the date of his termination of November 2018, Mr. Brown was a loyal and dedicated employee who served in the capacity of "upper management".

13.   Prior to Mr. Brown having surgery to replace both knees, Mr. Brown had several significant responsibilities with DLDS some of which were the following.

    a.  Handling insurance claims and purchasing, both for workers compensation and vehicle liability;

    b.  Going to court on behalf of DLDS to include participating in depositions;

    c.  Purchasing and maintaining permits for all company vehicles pertinent to the states in which the vehicles were operating;

    d.   Being available and on call twenty-four (24) hours per day to handle telephone calls;

    e.   Overseeing DLDS's entire maintenance program;

    f.   Holding and making purchases with pre-signed checks and credit cards on behalf of DLDS as needed;

    g.   Making reservations for his own lodging when he was required to travel on behalf of DLDS;

    h.   Approving anyone who was being considered for hire by DLDS;

    i.   Approving all purchases over $400.00 for equipment or parts needed for repair of equipment;

    j.   Purchasing new and used DLDS vehicles which sometimes required interstate travel. Some of the orders that Mr. Brown placed were for several million dollars; and

    k.   Completing all applicable road and fuel tax reports and payments for the states Diamond Line Delivery Systems, Inc. traveled through.

14.    Mr. Brown informed DLDS that he would be having surgery to replace both of his knees.

15.    Prior to Mr. Brown having the surgery, Mr. Calvin Fillmore began questioning Mr. Brown's ability to perform tasks that were part of his responsibility once Mr. Brown recovered enough to work remotely from home and when he returned to the terminal.

16.    On September 28, 2017 Mr. Brown had double knee replacement surgery at St. Alphonsus Regional Hospital in Boise, Idaho.

17.     In December of 2017, Mr. Brown started working remotely from home and in January of 2018 back at the Meridian Terminal. Mr. Brown took calls and helped when needed throughout the time he was away from the office.

18.     It was during this time, that Mr. Calvin Fillmore began to be very critical of Mr. Brown's work to the extent that Mr. Brown formed the impression that Mr. Calvin Fillmore was intent on having Mr. Brown leave DLDS.

19.     Almost immediately upon Mr. Brown's return to work, Mr. Calvin Fillmore started hounding/nagging Mr. Brown about things which he and Mr. Brown had previously reviewed within a few days of Mr. Brown's return to DLDS.

20.     During a Board of Director's meeting in the Summer or Fall of 2018, Mr. Calvin Fillmore tried to persuade Mr. Brown to resign from his position on the DLDS Board of Directors.

21.     Mr. Brown refused to resign from his position on DLDS Board of Directors.

22.     During the Spring and Summer of 2018 and at the direction and or knowledge of Mr. Calvin Fillmore, Mr. Brown lost many of the responsibilities that he once had at DLDS. The following are examples of Mr. Brown's diminished responsibilities:

    a.  Mr. Brown was not involved in the purchase of a $30,000 maintenance computer program even though he was nominally still in charge of maintenance;

    b.  Prior to his knee surgery, Mr. Brown oversaw calculating and completing the IFTA and Oregon Road Tax.  Indeed, prior to Mr. Brown's knee surgery he had taken care to train his Administrative Assistant to do the latter tasks during Mr. Brown's absence.  Upon Mr. Brown's return, Mr. Calvin Fillmore, insisted that the responsibility for calculating and completing the IFTA and Oregon Road Tax

would not reside with Mr. Brown and that Mr. Brown's Administrative Assistant would now assume responsibility for this task;

c.   Shortly after Mr. Brown's return to work from surgery, he learned that he would no longer be responsible for insurance renewal and key communications with insurance companies. Mr. Calvin Fillmore informed Mr. Brown that he, Mr. Calvin Fillmore would assume these insurance related tasks;

d.   Mr. Brown was no longer allowed to have in his possession pre-signed DLDS checks;

e.   Terminal managers were no longer required to contact Mr. Brown if repairs for equipment exceeded $400.00;

f.   Mr. Brown was no longer in charge of ordering vehicles for DLDS;

g.   Prior to his knee surgery, Mr. Brown was responsible for notifying management when an employee had tested positive for drugs. After Mr. Brown's return to work, he no longer had this responsibility;

h.   Mr. Brown had been entrusted with all needed credit card information since he started his employment with DLDS.  In October of 2018, he was no longer privy to the expiration dates of credit cards; and

i.   In October of 2018, Mr. Brown was told which lodging accommodations he should use while traveling for DLDS; previously he had chosen himself.

**Mr. Brown's Termination from DLDS; Business Reason Provided was  Pretense for Discriminatory Intent**

23.   On October 17, 2018, Mr. Brown became aware that DLDS moved a previous employee into a Terminal Manager position located in Twin Falls, Idaho.

24.     On October 18, 2018, at approximately 1000 hours, Mr. Brown made plans to drop in unannounced on Line Drivers and meet with them late at night at approximately midnight on November 1, 2018 as a result of the late start Mr. Brown had arranged to train the new terminal manager on Friday November 2, 2018.

25.     On October 29, 2018, Mr. Brown participated in a weekly executive meeting where he shared his tentative plans for the upcoming week.  In that meeting, Mr. Brown stated his plans for the week. It is standard for Executive Team members to travel the day before a meeting at a different terminal. It is also standard that not every single detail of an itinerary is discussed as members are familiar with the general nature of travel and training.

26.     At this same meeting which was also attended by Mr. Calvin Fillmore, Mr. Brown stated that he would be leaving for Twin Falls on or after lunch time.

27.     Mr. Doug Harris served as Vice President of Operations during the relevant time period.

28.     Mr. Doug Harris is a  "Jack-Mormon" who is not practicing the LDS faith.

29.      On the morning of October 30, 2018, Mr. Doug Harris called Mr. Brown requesting his assistance in holding an ESOP meeting at 0700 hours on November 2, 2018  in Twin Falls, ID. Mr. Brown agreed to support Mr. Doug Harris with this even though it was last minute and would change Michael E. Brown's plans for a meeting with line drivers late at night the day before.

30.     Ms. Dominique Kramer was the new Twin Falls Terminal Manager for DLDS.

31.     Mr. Brown, through a series of emails arranged to provide additional training to Ms. Dominique Kramer on or about October 30, 2018.

32.     On October 31, 2018, Mr. Brown completed and submitted IFTA with his assistant Ms. Camille La Bronte which was submitted at 1500 hours on October 31, 2018.

33.     At all times during the week of October 29, 2018 and November 1, 2018, Mr. Brown was engaged in his job responsibilities all day and night with the exception for meals and restroom breaks. As like any other day, Mr. Brown was always available by telephone day or night to immediately deal with any emergencies that occur from any or all terminals, roadways, vehicles or DLDS employees.

34.      It is clear that there was a misunderstanding regarding Mr. Brown's work itinerary for the week of October 29, 2018 - November 1, 2018. Whatever Mr. Brown stated in the October 29, executive meeting obviously gave the impression to Mr. Calvin Fillmore that Mr. Brown was training Ms. Dominique Kramer the afternoon or evening of November 1, 2018. However, if Mr. Calvin Fillmore had any serious concerns about Mr. Brown's work schedule, he only had to text or call and speak to Mr. Brown in person between Monday, October 29, 2018 and Thursday, November 1, 2018.

35.     The fact that it was always easily ascertainable to confirm that during the week of October 29, 2018 - November 1, 2018 Mr. Brown was engaged in legitimate activity on behalf of DLDS, Mr. Calvin Fillmore had no reason to terminate Mr. Brown for dishonesty.

36.     In the  November 1, 2018 letter of termination sent to Mr. Brown, Mr. Calvin Fillmore stated the following about Mr. Brown: "telling the management team that you would be in Twin Falls training our [DLDS] new terminal manager on Safety and Hiring Practices on Thursday afternoon and Friday and then not showing up on Thursday afternoon…"

37.     Although Mr. Brown like all other employees at DLDS were employees at will, Mr. Brown was terminated without having been afforded the due process that was available to all at will employees as stated in the DLDS employee handbook.

38.     Mr. Brown was not given an opportunity to defend himself against the false allegation in the presence of a third party.

39.     Mr. Brown was not given the opportunity to explain why the termination was unwarranted due to a mis-understanding on the part of Mr. Calvin Fillmore. Nor was Mr. Brown given an exit interview.

**In Terminating Mr. Brown DLDS Treated Him Substantially Different Than a Similarly Situated Management and Upper Management Non-LDS Employees  Based on Mr. Brown's Religion**

40.     Shortly after being hired, Michael E. Brown learned from Calvin Fillmore's wife, Myrna Fillmore that Calvin Fillmore was a "Jack-Mormon" (her words) and was not practicing the LDS faith.

41.      Mr. Brown is a devout and practicing member of the Church of JESUS CHRIST of Latter-Day Saints (LDS).

42.     In conversations with Myrna Fillmore, Mr. Brown learned that Mr. Calvin Fillmore drank alcohol and used tobacco products on a regular basis; which were against the teachings of the Church of JESUS CHRIST of Latter-day Saints.

43.     In 2009, Mr. Brown in conversation informed Mr. Calvin Fillmore that Mr. Brown's grandfather had previously served as the Presiding Bishop of the LDS church.

44.     Upon Mr. Brown's informing Mr. Calvin Fillmore about Mr. Brown's grandfather's role in the LDS church, Mr. Brown noticed that Mr. Calvin Fillmore reacted

with the disgust Mr. Brown would expect had Mr. Brown informed Mr. Calvin Fillmore that

Mr. Brown had stated that he supported dog fighting. Mr. Calvin Fillmore's silence was

deafening.

45.     Throughout the years of his employment with DLDS, Mr. Brown witnessed

Mr. Calvin Fillmore not enforce discipline on  DLDS personnel who were involved in alcohol

consumption that violated DLDS policy.

**Mr. Jim Noud  Former Vice President of DLDS**

46.     Mr. Jim Noud is a former employee of DLDS who served as Vice President of

Operations for DLDS. Mr. Jim Noud is not a member of the LDS church.

47.     Mr. Dave Murdock, prior to his termination from DLDS was serving as the

Terminal Manager for DLDS in Seattle.

48.     Sometime during the 2014 – 2015 time period, Mr. Dave Murdock found Mr.

Jim Noud slouched on the seat of a running DLDS vehicle in a hotel parking lot. Mr. Noud

was inebriated.

49.     By being found drunk in a running vehicle, Mr. Jim Noud was in violation of

DLDS's substance abuse policy described in the DLDS employee handbook which states the

following: "It is a violation of company policy for any Associate to report to work under the

influence of or impaired by alcohol."

50.     Mr. Jim Noud's actions (i.e. his inebriated state in a running vehicle) was a

violation of state and federal law, company policy, endangered employees, the public, and

risked damage to company and private equipment.

51.     Rather than, informing law enforcement, or requiring Mr. Jim Noud to submit

to a drug test or summarily terminating Mr. Jim Noud, Mr. Calvin Fillmore gave Mr. Jim

Noud the opportunity to resign rather than be terminated for his behavior.

52.     Mr. Calvin Fillmore's allowing Mr. Jim Noud to resign under those circumstance was in violation of DLDS policy involving critical offenses.

53.     Not only did Mr. Calvin Fillmore allow Mr. Jim Noud to resign instead of being terminated, Mr. Calvin Fillmore offered Mr. Jim Noud a severance package.

54.     Upon Mr. Jim Noud's departure, Mr. Calvin Fillmore sent a complimentary e-mail regarding Mr. Jim Noud's leaving DLDS wishing Mr. Jim Noud good luck.

55.     The termination of Mr. Jim Noud's employment with DLDS by Mr. Calvin Fillmore was in stark contrast to how Mr. Calvin Fillmore handled the unsubstantiated termination of Mr. Brown. There is little doubt that Mr. Calvin Fillmore's approach to terminating a blameless Mr. Brown was based in part on Mr. Calvin Fillmore's antipathy towards the LDS church and Mr. Brown who is a devout member of the LDS church.

**Ms. Amy Fisher Claims Representative/Manager for DLDS**

56.     Upon information and belief Ms. Amy Fisher was employed by DLDS from when DLDS purchased part of Key Trucking about 2012 until she was terminated in 2018.

57.     Ms. Amy Fisher served as the Claims Representative/Manager for all DLDS terminals. In that capacity,  Ms. Amy Fisher  worked out of the DLDS Seattle terminal.

58.     Ms. Amy Fisher had the authority to deny request or allocate funds, including determining the dollar amount checks were to be for claims that she approved.

59.     The claims that Ms. Amy Fisher approved were for when cargo damage or losses were involved.

60.     Ms. Amy Fisher is not a member of the LDS church

COMPLAINT  AND DEMAND  FOR JURY TRIAL                    Page 13 of 21

61.     Sometime in 2018 prior to Mr. Michael Brown's termination, Ms. Amy Fisher tested positive for controlled substances as a result of a random drug test authorized by DLDS.

62.     Ms. Amy Fisher was not immediately terminated as a result of DLDS having obtained knowledge of Ms. Amy Fisher having  tested  positive for an unauthorized controlled substance, despite it violating DLDS's Zero Tolerance company policy.

63.     Ms. Amy Fisher remained employed with DLDS for a number of days after DLDS obtained knowledge of Ms. Amy Fisher having  tested  positive for an unauthorized controlled substance.

64.     Although a violation of DLDS's Zero Tolerance company policy, Mr. Calvin Fillmore requested that Ms. Amy Fisher remain employed to help tie up loose ends and make the transition smoother for DLDS.

**Mr. Jared Freeman Meridian Terminal Manager for DLDS**

65.     Upon information and belief, Mr. Jared Freeman was employed by DLDS from sometime prior to Michael B's hiring until currently, first as a dock worker and the last several years, as DLDS's Meridian, Idaho Terminal Manager.

66.     During the timeframe of 2007 or 2008, Mr. Jared Freeman worked with Mr. Trent Fillmore as a dock worker for DLDS. It was during this time that Mr. Jared Freeman admitted to drinking alcohol on the property of DLDS.

67.     Mr. Jared Freeman was not terminated for this violation of DLDS policy. Instead, Mr. Jared Freeman was suspended with a loss of his Christmas bonus.

68.     During the timeframe of 2010-2013, with knowledge of Mr. Jared Freeman having received two (2) DUIs, Mr. Calvin Fillmore along with Mr. Doug Harris promoted Mr.

Jared Freeman to DLDS's Meridian, Idaho Terminal Manager.

69.     Upon information and belief and as a direct result of Mr. Jared Freeman's last DUI, Mr. Jared Freeman served prison time in an Idaho Department of Corrections facility.

70.     Although Mr. Michael Brown enjoyed working with Mr. Jared Freeman, He expressed his concerns about Mr. Jared Freeman's behavior to Mr. Calvin Fillmore and Mr. Doug Harris; however, Mr. Michael Brown's concerns were ignored.

71.     For several years during Mr. Jared Freeman's employment with DLDS, he operated his own business wherein he transported auto parts of the same type as DLDS transported.

72.     Although a violation of DLDS company policy, Mr. Jared Freeman was very open about this side business and what cargo he transported through his business.

73.     Mr. Calvin Fillmore was aware of Mr. Jared Freeman's business.

74.     Upon information and belief ,Mr. Calvin Fillmore did not raise any objection to Mr. Jared Freeman's violation of DLDS' policy that forbade an employee from operating a business similar to DLDS.

75.     Though Mr. Jared Freeman had employees, he often engaged in driving in support of his business.

76.     Mr. Jared Freeman frequently conducted his business from DLDS property/office on DLDS time.

77.     Mr. Jared Freeman often parked his trailer at the DLDS Meridian terminal and at times, Mr. Jared Freeman's employees would pick up trailers that Mr. Jared Freeman had towed to DLDS to expedite Mr. Jared Freeman's business transportation process.

78.     Mr. Jared Freeman  parked/stored one of his wrecked company trailers on DLDS's property for a significant amount of time without paying any fees.

79.     Mr. Jared Freeman is not a member of the LDS Church.

**Mr. Trent Fillmore Dispatcher DLDS Headquarters**

80.     Upon information and belief, Mr. Trent Fillmore was employed by DLDS from sometime prior to Mr. Michael Brown's hiring in 2007 until currently.

81.     Mr. Trent Fillmore is the son of Mr. Calvin Fillmore & Ms. Myrna Fillmore.

82.     Upon information and belief, Mr. Trent Fillmore is a heavy drinker.

83.     Mr. Trent Fillmore was initially hired as a dock worker and was eventually promoted to a driver for DLDS.

84.     During the timeframe of 2007 or 2008, Mr. Trent Fillmore worked with Mr. Jared Freeman as a dock worker for DLDS. It was during this time that Mr. Trent Fillmore admitted to drinking alcohol on the property of DLDS.

85.     Mr. Trent Fillmore was not terminated for this violation of DLDS policy. Instead, Mr. Trent Fillmore was suspended with a loss of  his Christmas bonus.

86.     Mr. Calvin Fillmore personally made up for the manpower shortage caused by Mr. Trent Fillmore's violation of DLDS policy by filling in for Mr. Trent Fillmore and assuming Mr. Trent  Fillmore's dock worker duties.

87.     Approximately one year prior to Mr. Michael Brown's termination from DLDS,  Mr. Trent Fillmore received  a second DUI along with speeding violations.

88.     One of Mr. Trent Fillmore DUI's was received after heavy drinking with Mr. Calvin Fillmore.

89.     As a result of Mr. Trent Fillmore's receipt of two (2) DUI's and other driving infractions, DLDS's insurance carrier did not desire to insure Mr. Trent Fillmore.

90.     As a result of DLDS's insurance carrier hesitation  to insure Mr. Trent Fillmore, Mr. Calvin Fillmore approved Mr. Trent Fillmore's promotion to Dispatcher at the main terminal (a desk job).

91.     The promotion of Mr. Trent Fillmore to Dispatcher came with more regular hours and more consistent  pay.

92.     Often  DLDS drivers who were no longer insurable were terminated from their employment with DLDS; and, certainly none other than Mr. Trent Fillmore were promoted.

93.     Upon information and belief, Mr. Trent Fillmore is a Jack Mormon who is inactive or lapsed member of the LDS Church.

94.     Mr. Michael Brown, a practicing member of the LDS Church while employed by DLDS, unlike a non-LDS  employee, was never found to be inebriated in a DLDS vehicle.

95.     Mr. Michael Brown, a practicing member of the LDS Church while employed by DLDS, unlike a non-LDS  employee, never tested positive for the possession of an unauthorized or illegal controlled substance as a result of a random drug test authorized by DLDS.

96.     Mr. Michael Brown, a practicing member of the LDS Church while employed by DLDS, unlike a non-LDS employee, was never incarcerated for driving under the influence of alcohol.

97.     Mr. Michael Brown, a practicing member of the LDS Church while employed by DLDS, unlike a non-LDS  employee was never engaged in a private business that was in direct competition with DLDS.

98.     Mr. Michael Brown, a practicing member of the LDS Church while employed by DLDS and while owning a business, unlike a non-LDS employee, never, conducted his privately owned business while on DLDS time.

## V.  CLAIMS OF UNLAWFUL DISCRIMINATION

### COUNT I

**Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. I.C. §§ 67-5909(1) and 67-5901 (Wrongful Termination)**

99.     Plaintiff restates, incorporates and re-alleges paragraphs 1 through 98 herein as paragraph 99 of this Count One.

100.    The Americans with Disabilities Act (ADA) 42 U.S.C. §§ 12101 -12213 prohibits discrimination against qualified individuals with disabilities.  An individual with a disability is defined as a person who:

- Has a physical or mental impairment that substantially limits one or more major life activities;

- Has a record of such an impairment; or

- Is regarded as having such impairment.

101.    The facts presented in this complaint establish that Mr. Brown, because he was regarded as a person having a disability lost many of his former responsibilities which by definition means that Mr. Brown suffered an adverse employment action(s). [4]

---

[4] A "tangible employment action in most cases inflicts direct economic harm." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, ***reassignment with significantly different responsibilities***, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Kohler v. Inter-Tel Technologies,* 244 F.3d 1167, 1179 (9th Cir.2001)…A

102.    The violation of the latter federal and state statutes justifies an award inter alia, of

back pay, reinstatement or front-pay, liquidated damages interest, and any and all other damages,

that he is entitled to under law against the Defendant.


## COUNT II

**Discrimination in Violation of 42 U.S.C. § 2000e (Title VII of the Civil Rights Act of 1964 as amended) and I.C. §§ 67-5901 and 67-5909 (1)**
**(Wrongful Termination Religion)**

103.    Plaintiff restates, incorporates and re-alleges paragraphs 1 through 102 herein as

paragraph 103 of this Count Two.

104.    By virtue of the foregoing, Defendant, by and through its agent Mr. Calvin

Fillmore caused Mr. Brown to suffer as a victim of deliberate and unlawful discrimination due to

Mr. Brown's religion in violation of 42 U.S.C. § 2000e (Title VII of the Civil Rights Act of 1964

as amended) and I.C. §§ 67-5901 and 67-5909(1).

105.    As a result of this violation, Mr. Brown, a devout and practicing member of the

LDS church, suffered the adverse employment action of being unlawfully terminated from his

position with the Defendant because of his religion.


## COUNT III

---

materially adverse change might be indicated by a termination of employment,, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, ***significantly diminished material responsibilities, or other indices that might be unique to a particular situation.***" *Crady v. Liberty Nat. Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); *see Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir.2000) (adverse employment actions may include "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion").

*Hill v. England* 2007 WL 3096707, 9 (E.D.Cal.) (E.D.Cal.,2007)(Emphasis added).

**Negligent Infliction of Emotional Distress**

106.     Plaintiff restates, incorporates and re-alleges paragraphs 1 through 105 herein as paragraph 106 of this Count three.

107.     That it was clearly foreseeable that the manner in which Defendant treated Plaintiff during his employment and subsequent termination would cause Plaintiff mental and emotional distress which would result in physical manifestations detrimental to Plaintiff's health.

108.     That Defendant's actions caused Plaintiff to suffer emotional and physical distress, and that due to Defendant's conduct, Plaintiff has suffered from humiliation, loss of confidence, loss of self-respect and self-worth, profound stress and anxiety, depression, anger, frustration, and hopelessness.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Michael E. Brown, respectfully prays for judgment against Defendant as follows:

A.     For a money judgment representing compensatory damages in the amount of no more than three-hundred thousand dollars ($300,000.00);[5]

B.     For reinstatement or front pay in lieu of reinstatement if reinstatement is not viable[6] in an amount to be determined at trial;

C.     For a money judgment representing punitive damages for Defendant's reckless indifference to the federally protected rights of Plaintiff in an amount to be determined at trial; *see fn.* 5;

D.     For a money judgment representing prejudgment interest, if applicable;

---

[5] See *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1264 (9th Cir. 2009) citing  42 U.S.C.§ §1981a(a), 1981a(a)(2) and 1981a(b)(3).

[6] *See Pollard v. E.I. du Pont de Nemours & Company*, 532 U.S. 843, 121 S.Ct. 1946 (2001).

E.      For attorney's fees and costs incurred by Plaintiff in bringing and prosecuting this cause of action; and

F.      For such other and further relief as may be just and proper.

## VII. DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted,

PLAINTIFF
By Plaintiff's Attorney

Idaho Employment Law Solutions, PLLC

R.A. (RON) COULTER